Filed 10/2/24  Bidoglio v. Plutos Sama CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| ANA BIDOGLIO,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>PLUTOS SAMA, LLC et al.,<br><br>    Defendants and Respondents. | G062998<br><br>(Super. Ct. No. 30-2017-00943907)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Israel Claustro, Judge. Affirmed in part, reversed in part and remanded as directed.

Henry J. Josefsberg for Plaintiff and Appellant.

No appearance for Defendants and Respondents.

\*          \*          \*

In order to establish a claim for hostile work environment harassment based on gender under the Fair Employment and Housing Act (FEHA)(Gov. Code § 12940 et seq.)[1], a plaintiff must be able to show that she was subjected to the offending behavior or conduct because of her sex. Similarly, to establish a claim for retaliation under FEHA, the plaintiff must be able to establish she was subjected to an adverse employment action or terminated "because [she] opposed any practices forbidden under" FEHA. (§ 12940, subd. (h).) In this case, appellant sued her former employer, a law firm, for a number of common law and FEHA claims, including disability discrimination, sex-based harassment and retaliation.

In a bench trial, she was able to present significant evidence of continuous harassment in the workplace by a coworker. However, she had little evidence, if any, that the harassment was based on her sex. She also presented evidence to suggest she was fired for raising doubts as to the legality of her firm's business structure and internship program. The trial court sided with her on her wrongful discharge claim, but found against her on her harassment and retaliation claims under FEHA, finding a lack of proof that the harassment and retaliation were motivated by appellant's gender or claimed disability. We see no error in the trial court's conclusions on these issues, and affirm them. However, we remand the judgment for determination, calculation and award of prejudgment interest on the claims as to which appellant was successful.

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

STATEMENT OF FACTS

Ana Bidoglio was hired to be the legal recruiting and development manager at the Irvine law firm of Wilson Keadjian Browndorf (Wilson Keadjian) and its affiliate law firm BP Fisher Law Group in or around December 2015. The two law firms are subsidiaries of an entity formerly known as Plutos Sama, LLC (Plutos Sama). Plutos Sama was later renamed LF Runoff 2, LLC. This entity is the 99 percent owner of Wilson Keadjian. The purse strings and management of Plutos Sama and its affiliated companies were all controlled by Matthew Browndorf.

Bidoglio began her employment on January 4, 2016, and worked to develop and implement recruitment opportunities for attorneys of all levels to the firm. She reported to the firm's human resources director, Alexandra Levin. Respondent Michele Stover was the corporate controller for Plutos Sama, and in that capacity, she handled accounting and day-to-day financial operations for the firm.

In researching for her job interview, Bidoglio had noticed Wilson Keadjian's website touted it as a "white shoe" firm, but she did not recognize it as being in the top 100 or 200 firms in the country. After beginning her employment, Bidoglio was told by Levin that the firm wanted her to recruit attorneys with substantial books of business. Bidoglio thought she would require more resources to recruit attorneys of such prominence. But she was told she could not engage with outside recruiters in order to look for talent. The firm ended up hiring several candidates, but all of these recruitments took place without her knowledge or involvement.

Almost immediately upon starting at Wilson Keadjian, Bidoglio began to have clashes with Michele Stover. About a month after she started, Bidoglio alleged Stover burst into a conference room while she was discussing

candidate interviews with one of the lawyers at the firm. Bidoglio said Stover began ranting in a raised tone of voice about not being able to find Bidoglio at her desk. Bidoglio told Levin about this incident and asked her to speak to Stover about the conduct.

In the spring of 2016, Levin asked Bidoglio to take charge of purchasing gifts on behalf of the firm to its administrative staffers for Administrative Professionals Day. When Bidoglio asked Stover to provide a firm credit card to use to make the purchases, Stover questioned Bidoglio as to why she was being asked to do this. After Bidoglio told her that approval had been received to spend $25 per person, Stover asked her why she went "over budget." Bidoglio forwarded the e-mail thread with Stover to Levin.[2]

The confrontations continued into May. Stover wrote what Bidoglio believed to be a "mean, nasty" e-mail to Bidoglio when she submitted an expense report for a trip to the firm's Maryland office. She would not provide Bidoglio with credit card information to order pizza for a presentation being given at the firm. Bidoglio spoke to Levin about the behavior, because she felt it was becoming a daily occurrence.

On May 3, 2016, Levin sent a firm-wide e-mail stating that Bidoglio would be taking on the role of office manager, in addition to her legal recruiting duties. Bidoglio found out about this when a colleague forwarded her the e-mail; she apparently did not receive it. She was purportedly given

---

[2] Stover forwarded Levin Bidoglio's e-mail response, which said: "I provided all the information that you need, and I don't have time for this. Go talk to Alexandra." Stover thought the e-mail was "unacceptable" and asked Levin to "speak with Ana about her attitude," claiming she had other e-mails showing "this same aggression."

4

this role because she was not recruiting enough new attorneys. She did not think the new role utilized her professional skill set.

Around May 20, Stover asked Bidoglio to obtain cleaning services for the office of a law clerk who had just passed the bar. The firm had held an impromptu celebration in his office and it had been doused in champagne. Bidoglio asked Stover which cleaning service to use, and Stover responded that maybe she needed to "take care of this [her]self." She later told Bidoglio "when we have to have it redone, I will handle it." Bidoglio forwarded the e-mail to Levin, and told Levin Stover was trying to "micromanage [her]."

On May 26, Bidoglio reported to Levin another uncomfortable conversation with Stover. Bidoglio said Stover had come into her office complaining about delayed mail delivery, which was an issue Bidoglio had been trying to get resolved with the postal service. Bidoglio said Stover would not let her explain what she was doing to fix it and barked at her in a sharp and rude manner. Bidoglio felt "bullied and belittled" and thought Stover's "modus operandi [wa]s to come stir the pot with [Bidoglio], bully [her], and then tone it down with some sort of written communication that is not apologetic in any way." Bidoglio said Stover was continuing to act like her supervisor and demanding answers to her questions. She asked to schedule a meeting with Levin and Stover if the behavior continued.

On at least one occasion, Bidoglio told Stover her behavior was unacceptable. Bidoglio felt there was a target on her back, though she could not say whether Stover's treatment of her was based on her sex or not. She said she never saw Stover treat men the way she treated her.

Sometime in June 2016, presumably at Levin's and Bidoglio's urging, Matthew Browndorf had a discussion with Stover about her behavior.

5

But one month later, Bidoglio was again e-mailing Levin to report about Stover's conduct towards her, this time in connection with payroll.

In June, the firm held a happy hour for legal interns to interact with the attorneys. Bidoglio wrote an e-mail to the chief financial officer of the firm, Pat Farenga, as well as Stover, to ask them to issue a directive for a drink limit because of the cost. She stated "[u]nbeknownst to me, Michele spoke to Matt this morning, which resulted in this small event now becoming another firm wide event." Stover told Bidoglio, "I speak to Matt several times a day about money and happenings in the office and I will not be informing you before I do so."

That same month, Bidoglio asked Stover for credit card information again, this time to pay a handyman to fix some loose molding and hang pictures in an office. Stover told her to cancel the handyman because the expense was not approved. At one point, when Bidoglio sought approval for an appliance repair in the firm's kitchen, Stover responded with "wow! I am not even dealing with you right now. [¶] I will handle this later."

In August, the firm held a party at Browndorf's residence. The following Monday, the receptionist, Tawnya Brink, sent out an e-mail telling employees they could submit receipts for Uber or Lyft if they took those modes of transport home from the party. The e-mail advised employees to give their receipts to Bidoglio. Stover responded to Brink and Bidoglio with the following: "What the h[***] is this? Not approved in any way." This prompted a tense e-mail exchange between Stover and Bidoglio. Bidoglio told Stover to "watch the manner in which" she communicated, and Stover told her "Please do not ever send emails about accounting procedures without checking with me." Bidoglio reported the exchange to Levin.

6

By September, Bidoglio said, she had been incurring firm-related expenses out of her own pocket because of Stover's refusal to provide her with a firm credit card. She complained to Levin that Stover was leveraging this and using her power to obstruct Bidoglio's reimbursements. At the end of September, Bidoglio's employment had been terminated. She testified her termination was "done in . . . a rush" and she did not have the chance to fully review her expense reports and get reimbursed. Pat Farenga said she had been paid everything she was owed, though Bidoglio disagreed.

PROCEDURAL HISTORY

On September 15, 2017, Bidoglio filed a complaint against Plutos Sama, Wilson Keadjian, Stover, and Browndorf, alleging the following causes of action: (1) disability discrimination, (2) harassment, (3) gender discrimination under FEHA, (4) failure to remit taxes, (5) overtime and break premiums, (6) failure to reimburse expenses, (7) conversion, (8) wage continuation penalty, (9) retaliation under FEHA as well as the Fair Labor Standards Act and Labor Code, (10) failure to prevent discrimination, harassment and retaliation under FEHA, (11) wrongful termination in violation of public policy, and (12) unfair business practices. All defendants answered the complaint. After four years of delays, exacerbated by defendants cycling through attorneys, a bench trial commenced on December 14, 2022. Browndorf, Plutos Sama, and Wilson Keadjian did not appear. Stover appeared in propria persona.

The court took testimony over several days from Bidoglio and Stover, amongst other witnesses, and Bidoglio lodged deposition transcripts of Levin, Stover, and Browndorf with the court. On December 20, the trial court issued its ruling. It found in favor of defendants on Bidoglio's disability discrimination, gender harassment, gender discrimination, conversion,

7

retaliation, and failure to prevent claims. The court denied relief on gender harassment and discrimination because it found there was no evidence that Stover's behavior was motivated by Bidoglio's sex. The court pointed to the fact that Stover admitted getting into verbal altercations with a male attorney at the firm, and concluded there was no evidence Stover specifically targeted women for harassment.

The court found in Bidoglio's favor on all remaining claims. Judgment was entered on February 28, 2023, awarding Bidoglio $222,531.95 in damages. However, the court did not fill in any amounts for prejudgment interest.

On March 2, 2023, Bidoglio filed a notice of intention to move for new trial. In addition to seeking the missing prejudgment interest, Bidoglio claimed inadequate damages, an error of law, and insufficiency of the evidence to justify the verdict. With respect to gender harassment, she argued she had shown evidence that several women at the firm had been subjected to similar treatment by Stover, which the trial court had not noted in its findings. As to retaliation, Bidoglio contended she had engaged in protected activity by complaining about Stover's conduct, whether or not she actually had a colorable harassment claim.

The court held a hearing on the motion for new trial on May 1, 2023. The court denied the motion except as to damages. It ordered the judgment modified to add $30,000 to the judgment for future mental health and emotional distress damages, and ordered Bidoglio to submit a proposed amended judgment.

The amended judgment was entered on June 5, 2023. The total amount of damages was increased to $246,031.95. Again, there was no mention of prejudgment interest in the amended judgment.

8

Bidoglio filed a notice of appeal on August 21, 2023. She appealed the trial court's December 22, 2022 minute order, its denial of new trial, the February 2023 judgment, and the June 5, 2023 amended judgment.

## DISCUSSION

### I.
#### TIMELINESS OF APPEAL

We invited briefing from the parties on the issue of whether this appeal is timely, given the length of time elapsing from entry of the amended judgment on June 5. Bidoglio persuasively argues the appeal is timely because it was filed within 180 days of entry of the original judgment on February 28, 2023. Under California Rules of Court, rule 8.104(a), a notice of appeal must be filed on the earliest of three possible dates. The first is the date the superior court clerk serves a notice of entry of judgment, or a file-stamped copy of the judgment showing the date it was served. (*Id.*, rule 8.104(a)(1).) No such document was sent to Bidoglio based on our review of the record. The second date is the one on which any party serves on the appellant a notice of entry of judgment. (*Id.*, rule 8.104(a)(2).) This did not occur; indeed, no other defendants appeared for trial aside from Michele Stover, who was self-represented. The third date is 180 days from entry of judgment. (*Id.*, rule 8.104(a)(3).) The original judgment was entered on February 28, 2023, and the notice of appeal was filed 174 days after that judgment was entered. It is therefore timely.

### II.
#### STANDARD OF REVIEW

Bidoglio raises three main arguments on appeal. First, she claims the trial court applied an incorrect standard of law when it found against her

on her gender-based harassment claim.[3] Second, she contends the trial court erred in its finding on her retaliation claim, because her complaints about Stover were in good faith and constituted protected activity. Finally, she contends the trial court erroneously refused to award her prejudgment interest on her successful claims.

"We review the trial court's factfinding for substantial evidence. This traditional standard of review is highly deferential. It has three pillars. First, we accept all evidence supporting the trial court's order. Second, we completely disregard contrary evidence. Third, we draw all reasonable inferences to affirm the trial court. These three pillars support the lintel: we do not reweigh the evidence. (See *Harley-Davidson, Inc. v. Franchise Tax Bd.* (2015) 237 Cal.App.4th 193, 213-214.) Under this standard of review, parties challenging a trial court's factfinding bear an "'enormous burden'" (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1071.)" (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581-582.)

"'. . . [W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."' [Citation.]" (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466.) We apply this standard

---

[3] She also challenges the trial court's finding on her failure to prevent claim under FEHA, but acknowledges reversal would be contingent on reversal of her harassment or discrimination claims, so we must address that issue at the outset.

to the first and second issues, and conclude Bidoglio cannot meet her burden on appeal.

Bidoglio's claim of prejudgment interest on her successful claims is an issue of damages subject to de novo review. (See *Switzer v. Wood* (2019) 35 Cal.App.5th 116, 125.)

III.

HARASSMENT

For a hostile work environment claim under FEHA, the plaintiff must show that gender was a substantial factor in the harassment she experienced, and had she been a man, she would not have been treated in the same manner. (See *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 280.)

While the court found what it called "substantial evidence of harassment and a hostile work environment, there [wa]s a lack of substantial evidence that" Stover's conduct "was *motivated* by" Bidoglio's gender. The court said it could discern no other evidence that Stover behaved the same way to other females, and there was evidence she had behaved the same way towards a male attorney.

Bidoglio takes issue with this finding. She points to Levin's deposition testimony, in which Levin stated Stover "had kind of two categories of people—people that she behaved that way with and people that she didn't behave that way with." Levin explained she herself had been the victim of Stover's behavior, and Browndorf's assistant, Arden Libby, had made a few similar complaints about Stover, although Levin could not remember the details. Libby was also a female, and so Bidoglio claims the only people who seemed to have an issue with Stover were women. Thus, she

11

argues, the trial court was incorrect to say there was no evidence of harassment toward other females.

It is true that there was some evidence in the record that Stover was rude and condescending to other women, but it is not evidence that compels us to overturn the trial court's findings. First, Arden Libby was never called to testify; there is no evidence of her specific complaints about Stover. And Levin's experience with Stover was very similar to Bidoglio's: a generally rude tone and volcanic temper. Nothing about these interactions indicates Stover harbored any gender bias or was treating either Levin or Bidoglio in this manner because of their gender. There are no gender-specific comments or dynamics which would reflect that Stover's behavior was born out of bias towards other women. Instead, the record gives the impression that Stover was simply an unpleasant person in the workplace.[4]

Bidoglio asks us to reverse the trial court's finding because it would sanction an "'equal opportunity harasser'" defense. (See *Sharp v. S&S Activewear, L.L.C.* (9th Cir. 2023) 69 F.4th 974, 977, quoting *Swinton v. Potomac Corp.* (9th Cir. 2001) 270 F.3d 794, 807 (*Sharp*).) In *Sharp*, several women and one man brought a hostile work environment claim against their employer because the employer allowed employees to loudly play music in the workplace which was sexually graphic, violent, and misogynistic. (*Id.* at p. 977.) The employer brought a motion to dismiss, which was granted in part. The trial court concluded there could be no sexual harassment if both men

---

[4] This is in no way meant to diminish or minimize the experiences of those who had to deal with Stover's behavior on a daily basis, such as Bidoglio, and we certainly do not condone rude behavior in the workplace as a general matter. But whether Bidoglio can recover against defendants for such behavior is another matter entirely.

and women were offended by the music. (*Id.* at p. 978.) The Ninth Circuit disagreed, and concluded the viability of a sexual harassment claim could not hinge on whether the victims were only one or the other gender. (*Id.* at p. 982.)

We agree with the *Sharp* court; the fact that harassment affects men and women alike does not, and should not, doom a hostile work environment claim. But the harassment must be *based on* gender. In *Sharp*, such harassment was present; the hostile work environment was created by sexually violent, misogynistic music which objectified women. In this case, there is no evidence that Stover's behavior was based on gender or targeting gender at all. And to the extent Bidoglio sought to establish that Stover only treated women badly, the trial court refuted this by pointing out that she seemed to treat men badly as well.

## IV.

### RETALIATION

To establish a prima facie case of retaliation under FEHA[5], the plaintiff must demonstrate that she engaged in protected activity under the statute, she was subjected to an adverse employment action, and there was a causal link between the protected activity and the adverse action. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1043.) The trial court's finding on this point is unclear; it found Bidoglio had not "proven that her complaints about harassment or harassment was substantially motivated by her request

---

[5] While Bidoglio's retaliation claim was originally pleaded under FEHA, the Fair Labor Standards Act, and the Labor Code, she only raises the FEHA ground on appeal, and so FEHA is the sole focus of our inquiry.

13

for accommodations for a disability." But ultimately, the trial court found in defendants' favor on this claim.

". . . [U]nder certain circumstances, a retaliation claim may be brought by an employee who has complained of or opposed conduct, even when a court or jury subsequently determines the conduct actually was not prohibited by the FEHA. Indeed, this precept is well settled. (*Flait v. North American Watch Corp.* [(1992)] 3 Cal.App.4th [467,] 477 [the plaintiff may prevail 'even if the harassment was not sufficiently severe or pervasive that it altered [the plaintiff's] work environment']; *Moyo v. Gomez* (9th Cir.1994) 40 F.3d 982, 985; *Gifford v. Atchison, Topeka & Santa Fe Ry. Co.* (9th Cir.1982) 685 F.2d 1149, 1157.) An employee is protected against retaliation if the employee reasonably and in good faith believed that what he or she was opposing constituted unlawful employer conduct such as sexual harassment or sexual discrimination. (*Flait v. North American Watch Corp.*, *supra*, 3 Cal.App.4th at p. 477; see also *E.E.O.C. v. Crown Zellerbach Corp.* (9th. Cir.1983) 720 F.2d 1008, 1013, fn. 2.)" (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 473-474.)

Here, Bidoglio may reasonably and in good faith have believed she was reporting conduct prohibited under FEHA, and the trial court's finding that she had not established sexual harassment does not negate that. Bidoglio also showed that she was subjected to some adverse employment actions—namely, a seeming demotion to office manager and her later termination. What is missing is any evidence that these adverse actions were causally related to her reporting sexual harassment or discrimination.

"The retaliatory motive is 'proved by showing that plaintiff engaged in protected activities, that his employer was aware of the protected activities, and that the adverse action followed within a relatively short time

14

thereafter.' (*Jones v. Lyng* (D.D.C.1986) 669 F.Supp. 1108, 1121.) 'The causal link may be established by an inference derived from circumstantial evidence, "such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision."' (*Jordan v. Clark* (9th Cir.1988) 847 F.2d 1368, 1376.)" (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 615.)

Bidoglio argues the trial court found there was a causal link between her firing and issues she brought to Browndorf's attention. Specifically, the court said it found "strong circumstantial evidence that Ms. Bidoglio was terminated because she questioned the law firm structure and that she raised the issue of her own wages as well as the wage rights of the legal interns." But, importantly, reporting such issues is not protected activity under FEHA. Section 12940, subdivision (h) forbids retaliation "because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." The forbidden practices to which the statute refers are discriminatory practices forbidden under FEHA, not reporting illegal activity or improper wage practices.

As for Bidoglio's demotion to office manager, there is no evidence to show it was causally connected to her reporting harassment by Stover. The demotion took place on May 3, and was announced to the firm by Levin. While Levin testified in her deposition that she told Browndorf every time Bidoglio complained about Stover, there is no evidence showing when these discussions took place relative to the demotion. Indeed, Levin testified Bidoglio was given office manager responsibilities because she was not

15

bringing in enough new recruits. Therefore, the trial court's ultimate determination in defendants' favor on the retaliation claim was correct.

Because we find the trial court was correct to find in defendants' favor on the harassment and retaliation claim, it stands to reason the failure to prevent claim was also properly resolved in defendants' favor.

V.

PREJUDGMENT INTEREST

Bidoglio's final concern is that the trial court refused to award her prejudgment interest on the claims as to which she prevailed. These claims were for failure to remit taxes, overtime and break premiums, failure to reimburse expenses, wage continuation penalty, and wrongful termination.[6] She contends she was entitled to interest under Labor Code section 218.6, which requires the court to award interest "on all due and unpaid wages at the rate of interest specified" in Civil Code section 3289, subdivision (b), or 10 percent per annum. While her claims for break premiums would not be qualifying "wages" for purposes of Labor Code section 218.6 (see *Naranjo v. Spectrum Security Services, Inc.* (2022) 13 Cal.5th 93, 122.), it appears at least some of her award for Labor Code-related claims should include prejudgment interest, including her claim for failure to remit taxes and failure to reimburse expenses. We therefore remand the matter to the superior court for further proceedings to determine the appropriate amount of interest due to Bidoglio on her prevailing claims.

---

[6] The court also found in Bidoglio's favor on her unfair business practices claim,but was unable to determine damages for lack of proof. Bidoglio has not challenged this finding on appeal.

16

## DISPOSITION

The amended judgment is reversed and remanded only for purposes of determining, calculating and adding to appellant's award the appropriate amount of prejudgment interest due on her prevailing claims. The amended judgment is affirmed in all other respects. The parties are to bear their own costs on appeal.

MOORE, ACTING P. J.

WE CONCUR:

GOETHALS, J.

GOODING, J.

17